**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **BOLD HOME PRODUCTS, LLC,** *et al.*, | : | |
| | : | |
| **Plaintiffs,** | : | **Case No. 2:20-cv-4020** |
| | : | |
| **v.** | : | **Chief Judge Algenon L. Marbley** |
| | : | |
| **CARBONKLEAN, LLC,** *et al.*, | : | **Magistrate Judge Chelsey M. Vascura** |
| | : | |
| **Defendants.** | : | |

<u>**OPINION & ORDER**</u>

This case involves a contract dispute between Plaintiffs Bold Home Products, LLC ("Bold Home") and E-Commerce Trade, LLC ("ECT") on one side and Defendants CarbonKlean, LLC, and Daniel J. Patton as CEO and President of CarbonKlean, on the other. This matter is before the Court on the following motions:

- Plaintiff's Motion for Summary Judgment on Counts 6, 8, and 9 of the Complaint (ECF No. 85) ("Plaintiffs' First Summary Judgment Motion");

- Plaintiff's Motion for Summary Judgment on Counts Three, Four, Five, Six, Seven and Eight on Defendant's First Redacted Answer and Counterclaim ("Plaintiffs' Second Summary Judgment Motion") (ECF No. 86);

- Defendants' Motion for Summary Judgment Contra Plaintiffs' Claims (ECF No. 87) ("Defendants' First Summary Judgment Motion"); and

- Defendants' Motion for Summary Judgment (ECF No. 88) ("Defendants' Second Summary Judgment Motion")

Following careful consideration and the benefit of oral argument, this Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' First Summary Judgment Motion (ECF No. 85),

**GRANTS** Plaintiffs' Second Summary Judgment Motion (ECF No. 86), **GRANTS IN PART AND DENIES IN PART** Defendants' First Summary Judgment Motion (ECF No. 87), and **DENIES** Defendants' Second Summary Judgment Motion (ECF No. 88). As such, this Court **DISMISSES** Plaintiffs' Count III and Defendants' Counts III–IX and **GRANTS** summary judgment in Plaintiffs' favor on Count VI of their Complaint.

## I. BACKGROUND

This case is, at its essence, the story of a contractual arrangement gone bad. Plaintiffs contracted with Defendants to sell Defendants' products through Plaintiffs' Amazon distribution network. Plaintiffs fell behind on payments they owed Defendants for their inventory of Defendants' products, prompting Defendants to terminate the contract. Given Plaintiffs' outstanding balance, however, Defendants entered into a second agreement providing Plaintiffs extended payment terms. Plaintiffs continued to sell Defendants' products as provided for under the original contract until shortly after Plaintiffs made their final payment to Defendants. At this point, Plaintiffs allege, Defendants initiated a campaign to bar them from selling Defendants' products on Amazon. Defendants' alleged tactics comprised of lodging false representations with Amazon that Plaintiffs engaged in dishonest business practices for which they were being criminally prosecuted. As Plaintiffs allege, this campaign successfully resulted in Amazon's decision to terminate Plaintiffs' access to its network. The parties assert various claims against one another, including breach of various contract terms, defamation, trademark and patent infringement, fraud, and intentional interference.

## A.  Factual Background[1]

Plaintiffs are Bold Home Products, LLC ("Bold Home"), and E-Commerce Trade, LLC ("ECT"). ECT is an intermediary e-commerce distribution business that maintains distribution relationships with vendors and customer relationships with online merchants, retailers, and consumers. (ECF No. 1 ⁋ 8). Amazon is one of its primary sales channels. (*Id.*). Bold Home, an affiliate of ECT, operates as an e-commerce distributor with relationships in various sales channels including Amazon. (*Id.*). ECT granted authority to Bold Home to sell products on its behalf, including Defendants' Peeps products, through Amazon and other sales channels. (*Id.* ⁋ 9). CarbonKlean was a vendor to ECT for eyeglass and glass/screen cleaning products which it named "Peeps." (*Id.* ⁋ 12). Daniel Patton is the President and CEO of CarbonKlean. (*Id.* ⁋ 4).

On December 10, 2015, Daniel Patton signed a memorandum of understanding ("MOU") with Parkside Optical, Inc. (ECF No. 88 at 2; ECF No. 87-1 at 69–72). Parkside owns several patented and trademarked products, including the Peeps eyeglass cleaner product. (*Id.*). Pursuant to the MOU, Patton developed the marketing and sales for the products that Parkside produced. (*Id.*). Patton formed CarbonKlean at the end of 2015. (ECF No. 86 at 6). CarbonKlean's first sale of the Peeps product on Amazon occurred through EyeLove, LLC in December 2015. (ECF No. 88 at 3).

ECT and CarbonKlean entered into an E-Commerce Trade Supplier Terms & Conditions ("Supplier Agreement") on August 8, 2016. (Supplier Agreement, ECF No. 1-1). Under the Agreement, ECT agreed to purchase Peeps from CarbonKlean and resell them on e-commerce platforms such as Amazon.com. (ECF No. 85 at 3). Notably, the Supplier Agreement states that all matters relating to it are to be governed and construed in accordance with California law.

---

[1] At summary judgment, this Court recites the facts in the light most favorable to the non-movant. *See, e.g., Lange v. McGinnis,* 644 F. App'x 672, 673 (6th Cir. 2016); *Jackson v. City of Cleveland*, 925 F.3d 793, 803 (6th Cir. 2019).

(Supplier Agreement, ECF No. 1-1 ⁋ 24). The Supplier Agreement also includes a "Non-Solicitation of Merchants and Non-Circumvention" provision which disallows CarbonKlean from directly or indirectly dealing with any merchant to which ECT introduced CarbonKlean during the term of the Agreement. (*Id.* ⁋ 14). This provision applies during the contract term and for up to one year following the termination of the contract. (*Id.*). The Supplier Agreement also includes an "Assignment" provision under which ECT retains the right to "assign or transfer any or all of its rights or obligations under this Agreement" to any affiliate or person acquiring "all or substantially all of ECT's assets" without CarbonKlean's written consent.[2] (*Id.* ⁋ 19). The Agreement also provided that ECT would sell the Peeps at $14.99 per unit. (ECF No. 1 at 6).

In late 2018, Plaintiffs placed several large purchase orders for Peeps with Defendants. (ECF No. 85 at 5). Plaintiffs were unable to generate the necessary revenue from their holiday sales to pay for the purchase orders; they instead ended up with an excess of Peeps inventory. (*Id.*). Plaintiffs consequently fell behind on payments, leading CarbonKlean to deem the Agreement terminated via a letter sent on April 1, 2019. (ECF No. 53 at 91–92). In April 2019, however, the parties entered into the "Purchase Terms Amendment Agreement" creating an extended repayment term. (*Id.* at 93). Under the terms of the Agreement, Plaintiffs agreed to repay Defendants in monthly installments of $150,000 starting April 15, 2019. (*Id.*). Plaintiffs also agreed to pay Defendants an additional $100,000 on April 15, 2019, "underst[anding] that funding for this payment will not result in [Plaintiff's] 3rd party partner selling product on or through Amazon."

---

[2] The Assignment provision provides:

> Supplier shall not assign, transfer, delegate or subcontract any of its right or obligations under this Agreement without the prior written consent of ECT. Any purported assignment or delegation in violation of this Section shall be null and void. No assignment or delegation shall relieve the Supplier of any of its obligations hereunder. ECT may at any time assign or transfer any or all of its rights or obligations under this Agreement without Supplier's prior written consent to any affiliate or to any person acquired all or substantially all of ECT's assets.

(ECF No. 1-1 ⁋19).

(*Id.*). The last sentence of the Agreement "expressly and irrevocably authorizes" Plaintiffs to "assign, transfer, or grant authority to sell all CarbonKlean LLC products related to this agreement." (*Id.*).

Plaintiffs made their last payment under the Amendment Agreement on August 5, 2019. (ECF No. 85 at 6). Plaintiffs raised the money to do so by selling the excess Peeps inventory on Amazon. (*Id.*). Having announced that the Supplier Agreement was terminated, Defendants entered in an agreement with Pharmapacks, LLC on May 2, 2019, to serve as its exclusive Peeps distributor for online platforms. (*Id.*). According to Plaintiffs, however, the Supplier Agreement's "Non-Solicitation of Merchants and Non-Circumvention" provision conflicted with Defendants' actual ability to make Pharmapacks, LLC the exclusive seller of Peeps on Amazon.[3] (*Id.* at 6-7).

Defendants' solution, Plaintiffs allege, was to inundate Amazon with a series of false allegations about Plaintiffs' business practices so that Amazon would remove Plaintiffs from its marketplace. (*Id.* at 7). According to Plaintiffs, Defendants started its "campaign to block Bold Home from selling on Amazon" in October 2019. (*Id.*).

Each new item that is offered for sale on Amazon is registered using the product's UPC. (ECF No. 87 at 3). At that point, the product is assigned a unique ten-digit alphanumeric identifying code, called an Amazon Standard Identification Number ("ASIN"). (Daniel Patton Affidavit, ECF No. 87-1 ⁋ 38). According to Defendants, neither Parkside nor CarbonKlean had

---

[3] The Non-Solicitation of Merchants and Non-Circumvention provision provides:

> During the term of this Agreement, ECT may introduce Supplier to various Merchants and work to incorporate Supplier's products into such Merchants' systems. Supplier understands and agrees that, unless this agreement is terminated by ECT, Supplier will not circumvent ECT and deal directly with such Merchants, and further agrees that during the term and for a period of one (1) year thereafter, it will not, directly or indirectly, call on or solicit any ECT Merchant with whom Supplier did business with through ECT during the term of this Agreement …

(ECF No. 1-1 ⁋14).

ever created an ASIN for a multipack of Peeps before 2020. (*Id.* ⁋ 39). Instead, the ASINs had only been approved by CarbonKlean and Parkside for individual Peeps products. (*Id.*). According to Defendants, Bold Home created UPCs and ASINs for a multipack of Peeps without Defendants' consent. (*Id.*). In the fall of 2019, CarbonKlean consultant Madeline Beck reported to CarbonKlean that there were more than the correct sixteen CarbonKlean ASINs listed for sale with Amazon for Peeps. (*Id.* ⁋ 40). Beck formerly worked for ECT. (*Id.* ⁋⁋ 25–26). Beck terminated her contract with ECT as their CarbonKlean account representative in September 2019—the month before coming to CarbonKlean as an independent contractor in October 2019. (*Id.* ⁋⁋ 26, 36). On CarbonKlean's behalf, Beck reported products to Amazon that lacked a CarbonKlean-created UPC or ASIN. (*Id.*). CarbonKlean soon thereafter received Amazon's decision to remove ASINs that had created with UPC codes that had not been provided by CarbonKlean. (*Id.* ⁋ 41). Around this same time, Defendants allege that they discovered several letters that had been forged by ECT purporting to be from CarbonKlean. (*Id.* ⁋ 42). One letter, signed January 30, 2018, allegedly used Patton's signed letterhead to authorize "Bold Home Products, LLC" to sell CarbonKlean's Products on Amazon.com. (*Id.* ⁋ 44).

In October 2019, CarbonKlean submitted multiple formal complaints to Amazon that "by offering the Products for sale on Amazon's e-commerce platform, ECT and Bold Home violated CarbonKlean's Trademark number: 5200100." (ECF No. 1 ⁋ 35). Plaintiffs first received notice from Amazon of Defendants' trademark allegations on October 1, 2019. (*Id.* ⁋ 36). Plaintiffs received additional notices of Defendants' continued trademark violation accusations on October 24, 2019, and October 25, 2019. (*Id.*).

At some point, Amazon suspended Plaintiffs' ability to sell Peeps on its platform. (*Id.* ⁋ 37). Plaintiffs allege that Amazon did this "in direct response to CarbonKlean's and/or Patton's

false allegations" concerning the letter forgery and misuse of the ASINs. (*Id.*). On November 1, 2019, "ECT and/or Bold Home" received formal notice from Amazon that their selling accounts were deactivated and all listings, including for the Peeps, had been removed from the platform. (*Id.*). Defendants nonetheless continued to notify Amazon of Plaintiffs' alleged wrongdoing for the next several months. Plaintiffs identified six statements throughout that time period compromising the subject of their Motions:

- **Statement #1:** On December 5, 2019, CarbonKlean informed Amazon that "[Bold Home] also sent forged documents from 'CARBONKLEAN CEO' and letterhead to Amazon and are actively being sued with criminal charges." (ECF No. 92-5 at 1).

- **Statement #2:** On March 11, 2020, CarbonKlean emailed Amazon the following:

    We have an active criminal lawsuit over this forged and false document, and we have the court documents to prove this (attached). The active lawsuit is an ongoing case, so Bold Home is unaware at this time they will be facing criminal charges when we go to trial.

(ECF No. 92-23 at 1).

- **Statement #3:** On March 11, 2020, CarbonKlean sent another email to Amazon purporting to attach a "[f]orged letter submitted by 3rd party Bold Home." (ECF No. 92-24 at 1).

- **Statement #4[4]:** On March 13, 2020, CarbonKlean emailed Amazon a reply to Amazon's response to Statement #2 with the subject line "Forged documents from Bold Home confirmed forged in criminal lawsuit." (ECF No. 92-25).

- **Statement #5:** On March 17, 2020, CarbonKlean emailed Amazon the following:

    We are still dealing with a major 3rd party offender, Bold Home Products. They have duplicated numerous Peeps ASIN under 3rd party UPCs to sell on replicated ASINs. They even submitted a forged document to Amazon to trick Amazon into thinking these duplicates are real. We have an active criminal lawsuit open with Bold Home Products for forging this document

---

[4] Although Plaintiffs identify this as a distinct statement, this Court notes that the subject line in this reply email is the same as used in Defendants' original email sent on March 11, 2020. This Court thus considers Statement #2 and Statement #4 to constitute the same incident.

on our CarbonKlean letterhead. I have attached the document where you will find this letter analysis and examples of the duplicates. I will send you any evidence you need to get rid off [sic] all violating ASINs and remove this brand from selling Peeps on Amazon entirely. Their brand abuse efforts have been extreme.

(ECF No. 85-1).

- **Statement #6:** On March 17, 2020, CarbonKlean emailed Amazon the following:

    On January 20, 2018, - Bold Home Products submitted a false and forged document to Amazon signed as CarbonKlean CEO Daniel Patton. In this letter, they provided Amazon several false and violating ASINs that they created as duplicates of existing Peeps ASIN. They also created several non-manufacturer created multipacks that the brand owner, CarbonKlean, was unaware of. This 3rd party seller failed to give Amazon accurate information, as well as our Peeps customers. They submitted a false document, and forged Peeps CEO signature to trick Amazon into believing the information was accurate. The letter attached is proof of forgery under an active criminal lawsuit v Bold Home Products.

(ECF No. 85-2).

- **Statement #7:** CarbonKlean emailed Amazon that "[w]e have an active criminal lawsuit open with Bold Home Products for forging this document on our CarbonKlean letterhead." (ECF No. 85-8).

On March 19, 2020, Amazon provided notice to CarbonKlean that Bold Home "is officially a blocked seller," and thereby restricted from being able to sell any products associated with CarbonKlean or the Peeps products. (ECF No. 102-19 at 2).

On October 11, 2019, CarbonKlean filed suit in this Court alleging various claims including breach of contract, promissory estoppel, unjust enrichment, conversion, trademark infringement, and patent infringement. *See CarbonKlean, LLC v. E-Commerce Trade, LLC, et al.*, Case No. 2:19-cv-04547 (S.D. Ohio 2019). Plaintiffs voluntarily dismissed the suit on October 29, 2019. For their part, Plaintiffs filed suit against CarbonKlean in the Chancery Court for Rutherford Count, Tennessee, on November 25, 2019. (ECF No. 85 at 8). The Chancery Court dismissed the case on personal jurisdiction grounds on April 27, 2020. (*Id.*).

CarbonKlean and Parkside executed a Joint Venture Agreement on April 22, 2021, memorializing CarbonKlean's formal right to distribute Peeps. (ECF No. 91 at 33–68).

## B. Procedural Background

On August 7, 2020, Plaintiffs filed their Complaint against Defendant for various state-law causes of action. (ECF No. 1). Plaintiffs seek both injunctive and compensatory relief. Plaintiffs' Complaint alleges: breach of contract (Counts I–III); violations of the Deceptive Trade Practices Act, O.R.C. §4165.01 and unfair competition (Counts IV and V); defamation (Counts VI and VII); and intentional interference with contractual relationships and with prospective economic advantage (Counts VIII and IX, respectively). In their Answer (ECF No. 8), Defendants similarly seek relief based on various state-law causes of action. Defendants' Counterclaims assert the following claims: breach of contract (Count II); promissory estoppel (Count III); unjust enrichment (Count IV); conversion (Count V); trademark infringement (Count VI); patent infringement (Count VII); and fraud (Count VIII).

Both parties filed their competing summary judgment motions on March 25, 2022. In their first Motion for Summary Judgment (ECF No. 85), Plaintiffs seek summary judgment on Counts VI, VIII, and IX of their Complaint. In their second Motion (ECF No. 86), Plaintiffs seek summary judgment on Defendants' Counts III–VIII. Defendants' first Motion (ECF No. 87) seeks summary judgment on Plaintiffs' Counts I, II, III, V, VI, VII, VIII, and IX. Defendants' second Motion seeks summary judgment on Defendants' Counts II, V, VI, VII, and VIII.

This matter is now ripe for review.

## II.      STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Berryman v.*

*SuperValu Holdings, Inc.*, 669 F.3d 714, 716–17 (6th Cir. 2012). The Court's purpose in considering a summary judgment motion is not "to weigh the evidence and determine the truth of the matter" but to "determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). A genuine issue for trial exists if the Court finds a jury could return a verdict, based on "sufficient evidence," in favor of the nonmoving party; evidence that is "merely colorable" or "not significantly probative," however, is not enough to defeat summary judgment. *Id.* at 249–50.

The party seeking summary judgment shoulders the initial burden of presenting the Court with law and argument in support of its motion as well as identifying the relevant portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). If this initial burden is satisfied, the burden then shifts to the nonmoving party to set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e); *see also Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) (finding that, after the burden shifts, the nonmovant must "produce evidence that results in a conflict of material fact to be resolved by a jury.").

In considering the factual allegations and evidence presented in a motion for summary judgment, the Court "views factual evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor." *Barrett v. Whirlpool Corp.*, 556 F.3d 502, 511 (6th Cir. 2009). Self-serving affidavits alone, however, are not enough to create an issue of fact sufficient to survive summary judgment. *Johnson v. Washington Cnty. Career Ctr.*, 982 F. Supp. 2d 779, 788 (S.D. Ohio 2013) (Marbley, J.). "The mere existence of a scintilla of evidence to support [the non-moving party's] position will be insufficient; there must be evidence on which

the jury could reasonably find for the [non-moving party]." *Copeland v. Machulis*, 57 F.3d 476, 479 (6th Cir. 1995); *see also Anderson,* 477 U.S. at 251.

## III.    LAW AND ANALYSIS

Each party submitted two motions for summary judgment: one moving to dismiss the opposing parties' claims and one moving for favorable rulings on their own claims. Because multiple claims are subject to the parties' cross-motions for summary judgment, this Court organizes its analysis of the motions on a claim-by-claim basis rather than by considering each motion in turn.

### A.  Choice of Law

The "Governing Law" section of the Supplier Agreement is a choice of law provision providing the following:

> All matters arising out of or relating to this Agreement are governed by and construed in accordance with the internal laws of the State of California without giving effect to any choice or conflict of law provision or rule.

(ECF No. 1-1 ¶ 24). This provision reads similar to a provision considered by another court in this district which provided: "[t]his Agreement shall be governed by the laws of the State of West Virginia without giving effect to the conflict or laws or choice of law provisions thereof . . . ." *In re E.I. du Pont de Nemours & Co. C-8 Pers. Inj. Litig.*, 316 F. Supp. 3d 1021, 1028 (S.D. Ohio 2015). The *E.I. du Pont* Court cited to several examples showing that "[c]ourts interpreting substantially similar contract provisions consistently find that the language relates to interpretation of the contract at issue and not to related tort claims." *Id.* In those cases, the *E.I. du Pont* Court explained, the other courts found that "the use of the limiting language 'this agreement' or 'this contract' does not encompass non-contract claims." *Id.* (collecting cases). This Court agrees and thus concludes likewise that the language in the Supplier Agreement is not applicable to the tort claims raised in this lawsuit.

11

### B. Plaintiffs' Claims

#### 1. Counts I-III: Breach of Contract

Defendants move for summary judgment against Plaintiffs' breach of contract claims. In their Complaint, Plaintiffs allege that Defendants breached three provisions of the Supplier Agreement: (1) the Non-Solicitation provision by doing business with Amazon—a merchant with whom Defendants did business through ECT—within one year of the termination of the agreement (Count I); (2) the Copyright provision by using ECT's intellectual property to sell its products online after the termination of the parties' business relationship (Count II); and (3) the Assignment provision by alleging to third-party e-commerce platforms that Bold Home does not have the right to sell the Products (Count III).

Defendants argue that Plaintiff's breach of contract claims should all be dismissed because ECT's failure to make timely payments excused CarbonKlean from further performance. Further, Defendants argue, Bold Home's claims should be dismissed because it never signed the Agreement and is thus not a party to it. Defendants contend that they never violated the Non-Solicitation of Merchants and Non-Circumvention provision because ECT never introduced CarbonKlean to Pharmapacks, nor did CarbonKlean deal with Amazon directly to sell its products. Defendants contend that they did not violate the Copyright provision because the artwork that CarbonKlean used after terminating the ECT Agreement was a recreation made by a consultant. Defendants finally argue that they did not violate the Assignment provision because Bold Home was never a party to the contract.

Plaintiffs argue that Defendants' business dealings with Amazon, albeit using Pharmapacks as a conduit, violate the Non-Solicitation of Merchants and Non-Circumvention provision. Plaintiffs cite to messages between CarbonKlean and Amazon as well as CarbonKlean's

act of hiring a consultant to manage its Amazon business to argue that Defendants also engaged *directly* with Amazon. With respect to the Copyright provision, Plaintiffs argue that ECT shared its content, designs, images and descriptions for CarbonKlean's products which CarbonKlean had the express duty to respect. Plaintiffs present evidence that CarbonKlean's Amazon product listings were using Bold Home's image content as late as October 29, 2019, six months after termination of the Supplier Agreement. (ECF No. 104-2). With respect to the Assignment provision, Plaintiffs argue that Defendants never cited any authority for its argument that Bold Home was a "third party beneficiary"; instead, it is an assignee of certain ECT rights under the Supplier Agreement. Further, Plaintiffs argue, their late payment did not excuse CarbonKlean's nonperformance for two reasons: (1) each of the three provisions are independent restrictive covenants that are not excused by Plaintiffs' alleged material breach, and (2) the Non-Solicitation of Merchants and Non-Circumvention provision survived the termination of the Supplier Agreement unless *ECT* terminated the agreement.

Under California law, the elements for breach of contract are "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis W. Realty, LLC v. Goldman*, 51 Cal.App.4th 811, 821 (2011). To negate a claim for breach of contract, the plaintiff's nonperformance must be material. *Tawfik v. Select Portfolio Servicing, Inc., No. 20-CV-02946-JSC,* 2021 WL 3861430, at *4 (N.D. Cal. Aug. 30, 2021) (citing *Brown v. Grimes,* 192 Cal. App. 4th 265, 277 (2011)). This is normally a question of fact, but it may be resolved as a matter of law if reasonable minds cannot differ on the issue of materiality. *Id.* The obligations of the parties to a contract are either dependent or independent. *Colaco v. Cavotec SA*, 25 Cal.App.5th 1172, 1182 (2018). The parties' obligations are dependent where one party is excused in the event the other party fails to perform when the

performance by one party is a condition precedent to the other party's performance. *Id.* But "where covenants of a contract are to be performed at different times, they are independent," and non-performance does not excuse the other party from the contract. *Id.*

As a threshold matter, the Contract expressly contemplates that ECT could assign its rights to Bold Home. (*See* ECF 1-1 ⁋19). Defendants' contentions that Bold Home was not a party to the contract thus lack merit. This Court proceeds to analyze each Count in turn.

With respect to Count I, the Non-Solicitation of Merchants and Non-Circumvention provision is plainly intended to survive the termination of the contract. (*See* ECF No. 1-1 ⁋`4). The provision restricts Defendants from dealing "directly or indirectly" with any ECT Merchant with whom Defendants did business while the Agreement was active. (*Id.*). It also expressly provides that this limitation is waived only in the instance that "this agreement is terminated by *ECT*." (*Id.*) (emphasis added). But *Defendants* cancelled the contract. Plaintiffs' present obligation to pay and Defendants' future obligation not to do business with the restricted merchants are covenants to be performed at different times; as such, Plaintiffs' failure to pay is not material to this dispute. *See Colaco*, 25 Cal.App.5th at 1182. The record evidence suggests that CarbonKlean continued to do business with Amazon after the termination of the Supplier Agreement. (*See, e.g.,* Madeline Beck Deposition, ECF No. 102 at 126:16–19) (attesting that Pharmapacks is currently the third-party Amazon *seller* for CarbonKlean). Whether CarbonKlean's contacts with Amazon, either directly or through Pharmapacks, constituted a breach of the Non-Solicitation of Merchants and Non-Circumvention provision remains a genuine issue of material fact. This Court thus **DENIES** Defendants' Motion as to Count I.

With respect to Count II, the Copyright provision recognizes the "content, design, images and descriptions" used in the parties' business relationship as Plaintiffs' property. (ECF No. 1-1 ⁋

21). As in Count I, Plaintiffs' present obligation to pay and Defendants' present and future recognition of Plaintiffs' rights to the intellectual property used in their business arrangements are independent obligations. *See Colaco,* 25 Cal.App.5th at 1182. Plaintiffs presented evidence that CarbonKlean continued using Bold Home's copyrighted content six months after the Supplier Agreement was terminated—a October 29, 2019 email in which Pharmapacks confirmed that the Peeps listings were still using Bold Home's creative content. (ECF No. 104-2). In response, Defendants submit only deposition testimony from Madeline Beck that Defendants never used any artwork from ECT. (Beck Dep., ECF No. 102 ¶ 19). But Beck's self-serving testimony is not enough to create an issue of fact sufficient to survive summary judgment. *Wolfe v. Vill. of Brice, Ohio*, 37 F.Supp.2d 1021, 1026 (S.D.Ohio 1999). Beck's testimony is also plainly contradicted by Plaintiffs' evidence. This Court thus **DENIES** Defendants' Motion as to Count II.

With respect to Count III, however, the record contains no evidence that Defendants breached the Assignment provision. The Assignment provision only restricts Supplier from assigning, transferring, delegating, or subcontracting its rights and obligations under the Supplier Agreement without ECT's prior written consent. (ECF No. 1-1 ¶19). There is no plausible reading of this provision which would restrict Defendants from *communicating* to others that Bold Home lacked entitlement to sell the Products. As such, this Court **GRANTS** Defendants' Motion as to Count III.

2. *Count V: Violations of the Deceptive Trade Practices Act and Unfair Competition by Daniel Patton*

Defendants next move for summary judgment as to Plaintiff's Count V claim that Defendant Patton made false representations of fact to Amazon concerning the Products in violation of the Ohio Deceptive Trade Practices Act, O.R.C. § 4165.02. Defendants' Motion argues

that Patton is not liable for two reasons: (1) Patton never had any direct contact with Amazon; and (2) any statements that Patton made alleging that there were criminal charges against Plaintiffs were not false because he subjectively believed that Plaintiffs committed forgery. Plaintiffs counter that there were direct contacts between Patton's email account and Amazon. Even if Patton did not personally send these emails, Plaintiffs argue, he authorized CarbonKlean's consultant to communicate with Amazon on his behalf. Further, Plaintiffs argue, Patton's subjective belief is irrelevant to the inquiry of whether his statements were false.

The Ohio Deceptive Trade Practices Act ("ODTPA"), O.R.C. § 4165.01, *et seq.*, imposes liability when "[a] person . . . in the course of the person's business, vocation, or occupation . . . [d]isparages the goods, services, or business of another by false representation of fact." O.R.C. § 4165.02(A)(10). Ohio courts analyze ODTPA claims like claims based on Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). *Evanston Ins. Co. v. Certified Steel Stud Ass'n*, 787 F. App'x 879, 885 (6th Cir. 2019). Therefore, "a plaintiff need not prove intent or willfulness to establish a . . . violation." *Id.* Under the ODTPA, the claimant "need only establish an injury that was proximately caused by a person who commits a deceptive trade practice" listed in the Act. *Torrance v. Rom*, 8th Dist. No. 108818, 2020-Ohio-3971, 157 N.E.3d 172, ¶ 53.

Although Plaintiffs argue that Patton is liable for his consultant's representations to Amazon that Plaintiffs were under criminal investigation, they fail to identify any authority that a party may be held liable for another party's communications under ODTPA. Further, such a reading has no support in the plain language of the statute. But Plaintiffs submitted evidence of communications to Amazon from an email using Patton's email signature alleging that Plaintiffs engaged in unscrupulous business practices. (*See, e.g.,* ECF No. 91-67). Patton acknowledged in his deposition that some complaints were sent from an email carrying his electronic signature. (Daniel Patton Deposition, ECF No. 91 at 270:6–25). There is thus a genuine issue of material fact

16

concerning whether Patton himself sent or caused to be sent to Amazon any emails containing false allegations about Plaintiffs. This Court thus **DENIES** Defendants' Motion as to Count V.

### 3. Counts VI and VII: Defamation by CarbonKlean and Daniel Patton

In Counts VI and VII, Plaintiffs allege that Defendants CarbonKlean and Patton, respectively, made and published false, non-permissive, and defamatory statements about Plaintiffs causing them damage. Plaintiffs assert both defamation and defamation *per se* theories. Plaintiff moves for summary judgment on Count VI, while Defendants move for summary judgment on both Counts VI and VII.

Plaintiffs argue that the record contains no factual dispute concerning whether Defendants made and transmitted the statements at issue to Amazon. Plaintiffs also argue that the allegations— that Plaintiffs forged Defendants' documents and were under criminal investigation—are indisputably false. According to Plaintiffs, Amazon terminated Plaintiffs from their marketplace because of the defamatory statements. Plaintiffs argue in the alternative that the statements also constitute defamation *per se* given the harmful nature of Defendants' allegations that Plaintiffs were under criminal investigation for forgery and fraud.

Defendants contend that they did not commit defamation because the allegations at issue were substantially true. Defendants maintain that the consultant who sent the emails alleging Plaintiffs were subject to criminal charges (Madeline Beck) believed subjectively that her statements were true. Defendants submit that, even if they committed defamation, they made the statements in good faith and are thus protected from a defamation lawsuit by qualified privilege; this is because CarbonKlean and Amazon have an interest in preventing sellers from presenting forged documents and creating non-compliant ASINs, and because the statements at issue were limited in scope.

A corporation can recover for defamation under Ohio law. *See, e.g., Akron-Canton Waste Oil, Inc. v. Safety-Kleen Oil Serv., Inc.,* 81 Ohio App.3d 591, 602–03, 611 N.E.2d 955, 963−64 (9th Dist.1992). To establish defamation under Ohio law, Plaintiff must establish: (1) that a false statement of fact was made; (2) that the statement was defamatory; (3) that the statement was published; (4) that the plaintiff suffered injury as a proximate result of the publication; and (5) that the defendant acted with the requisite degree of fault in publishing the statement. *Am. Chem. Soc. v. Leadscope, Inc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, ¶ 77. Regarding the first prong, a false statement of fact under Ohio law is "a statement that sets forth matters which are not true or statements without grounds in truth or fact. A statement is not a false statement if . . . [it] has some truth in it . . . [or] is subject to different interpretations . . . . " *Id.*

Defamation *per se* occurs when the statement is defamatory on its face, based on the direct meaning of the words used. *Rosado-Rodriquez v. Nemenz Lincoln Knolls Mkt.*, 7th Dist. No. 19 MA 0098, 2020-Ohio-4814, 159 N.E.3d 1214, ¶ 19. Defamation *per se* under Ohio law applies to statements which fit within one of four classes: (1) words that import a charge of an indictable offense involving moral turpitude or infamous punishment; (2) words that impute some offensive or contagious disease calculated to deprive a person of society; (3) words that tend to injure a person in his trade or occupation; and (4) in cases of libel only, words that tend to subject a person to public hatred, ridicule or contempt. *Mitchell v. Fujitec Am., Inc*., 518 F. Supp. 3d 1073, 1093 (S.D. Ohio 2021). Written words accusing a person of committing any crime are libelous *per se*. *Northeast Ohio Elite Gymnastics Training Ctr., Inc. v. Osborne*, 9th Dist. No. 07CA0117-M, 183 Ohio App.3d 104, 2009-Ohio-2612, 916 N.E.2d 484, ¶ 8. Damages are assumed as the result of defamation *per se*. *Mitchell*, 518 F.Supp.3d at 1093. Whether an unambiguous statement

constitutes defamation *per se* is a question of law. *Rosado-Rodriquez*, 2020-Ohio-4814, 159 N.E.3d 1214, at ¶ 22.

The defendant in a defamation case may invoke "qualified privilege," an affirmative defense "recognized in many cases where the publisher and the recipient have a common interest, and the communication is of a kind reasonably calculated to protect or further it." *Hahn v. Kotten*, 43 Ohio St.2d 237, 244, 331 N.E.2d 713, 718 (1975). Said privilege is lost, however, "if the communicator acted with actual malice and/or publishes the communication to one not entitled to the privilege." *Boden v. Anaconda Minerals Co.*, 757 F.Supp. 848, 856 (S.D.Ohio 1990). "If the communication is privileged, the plaintiff may not recover unless he/she demonstrates that the defendant made the statement(s) with actual malice, such as: ill will, spite, grudge, or some ulterior motive." *Buckner v. Gilliland*, 846 F. Supp. 2d 799, 804 (N.D. Ohio 2012).

There are seven statements at issue that were sent from Defendants to Amazon. (*See* ECF Nos. 92-5, 92-23, 92-24, 92-25, 85-1, 85-2, 85-3). All seven statements accuse Plaintiffs of fraud. Six of the statements alleged that there were pending criminal lawsuits against Plaintiffs for forgery. Plaintiffs do not allege that any of those six statements were sent from Patton. There are, however, emails to Amazon bearing Patton's signature which complain of Plaintiffs' alleged unscrupulous business practices. *See supra* Section III.B.2. There is a genuine issue of material fact as to whether Plaintiffs indeed committed fraud. There is also a genuine issue of material fact concerning whether Patton sent those emails or caused them to be sent emails. As such, summary judgment is improper as to the defamation claims against Patton.

There is no dispute, however, as to the falsehood of accusations attributable to *CarbonKlean* that there were pending *criminal* proceedings against Plaintiffs. *See Am. Chem. Soc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, at ¶ 77. This Court thus focuses on those

statements for the purposes of the present analysis. Despite the falsehood of the statements, the record is unclear as to whether they proximately caused Plaintiffs to suffer damages. Both parties submitted evidence placing in dispute whether Amazon removed Plaintiffs from its marketplace due to either Defendants' fraud allegations or to CarbonKlean's allegations that Plaintiffs were under *criminal investigation* for said alleged fraud.

CarbonKlean's statements nonetheless constitute defamation *per se*—for which a damages analysis is immaterial. *See Mitchell*, 518 F.Supp.3d at 1093. CarbonKlean's false allegations that Plaintiffs were under criminal investigation are statements which "tend to injure a person in his trade or occupation." *Id*. Moreover, the accused crime—fraud—is a crime of moral turpitude. *Id.* Whether Plaintiffs indeed committed the underlying fraud is in dispute. But CarbonKlean's demonstrably false representations that Plaintiffs were under *criminal investigation* for the fraud nonetheless constitute defamation *per se* for which damages are assumed.

This Court further rejects CarbonKlean's invocation of qualified privilege to escape liability despite its commission of defamation *per se*. As an initial matter, Defendants waived the defense of qualified privilege by failing to raise it in their Answer. *Hadi v. State Farm Ins. Companies*, No. 2:07-CV-0060, 2008 WL 4877766, at *10 (S.D. Ohio Nov. 12, 2008). Even on the merits, Plaintiffs put forth unrebutted evidence of an "ulterior motive" suggestive of actual malice, *Buckner*, 846 F.Supp.2d at 804, which defeats the qualified privilege defense. This Court finds the following considerations central to its conclusion: (1) CarbonKlean was incentivized by their exclusive distribution deal with Pharmapacks to remove Plaintiffs from the Amazon marketplace, and (2) CarbonKlean consultant Madeline Beck sent the defamatory statements on CarbonKlean's behalf not long after leaving ECT on less-than-favorable terms.

On the first point, not long before the defamatory statements were made, CarbonKlean hired Pharmapacks to be the *exclusive* seller of its Products even though Plaintiffs were still selling the items. (Patton Aff., ECF No. 87-1 ¶ 34). Plaintiffs thus impeded Defendants' ability to effectuate the new agreement. The record contains evidence that Defendants consequentially acted to prevent Plaintiffs from selling CarbonKlean products on Amazon. This evidence includes a CarbonKlean consulting services agreement promising a bonus to its consultant for removing successfully Plaintiffs as a Seller "of any CarbonKlean products on all Amazon platforms." (ECF No. 104-1). This agreement was signed by Madeline Beck. (Madeline Beck Deposition, ECF No. 102 at 55:25–57:22).

On the second point, consultant Madeline Beck came to work for CarbonKlean the month after she declined to renew her contract with ECT in September 2019. (Martina Sherman Deposition, ECF No. 94-1 at 58:6–58:16). Martina Sherman, Beck's supervisor while employed at ECT/Bold Home, informed Beck around that time that she would either be paid a part-time salary or required to come into the office "because she had been reprimanded multiple times for her performance in the previous months." (*Id.* at 58:6–59:14). Sherman had an earlier critical conversation with Beck in March 2019 because "Madeline had become increasingly unreliable." (*Id.* at 61:1–10). Sherman suggested ultimately that Beck take a full maternity leave longer than the shorter leave from which she just returned. (*Id.*). In response, Sherman testified, Beck requested that Sherman be "more accommodating of her because she had just had a baby." (*Id.* at 61:17–19). According to Sherman, "that was kind of the long and short of it." (*Id.* at 61:19–20). This exchange is captured in an email exchange between Sherman and Beck. (ECF No. 102-24). Beck confirmed that she signed her employment agreement with Defendants in October 2019—not long after Sherman spoke to her about her performance issues. (Beck Dep., ECF No. 102 at 61:9–62:5). The

record shows that Defendants promised Beck a $5,000 incentive to arrange for the removal from Amazon of the company from which she had just departed. (ECF No. 104-1). As such, even if Defendants had not waived the qualified privilege defense, the record evidence demonstrating the presence of actual malice renders the defense inapplicable.

Accordingly, this Court **GRANTS** Plaintiffs' Motion as to Plaintiff's Count VI and **DENIES** Defendant's Motion as to both Plaintiff's Counts VI and VII.

### 4. *Counts VIII and IX: Intentional Interference*

Parties submit cross-motions on Plaintiffs' counts of Intentional Interference. Under Count VIII, Plaintiffs allege that CarbonKlean intentionally interfered with Plaintiffs' contractual and business relationship with Amazon via making false and defamatory complaints causing the Plaintiffs to be removed from the Amazon platform. Under Count IX, Plaintiffs allege that CarbonKleans' intentional interference also caused the disruption of Plaintiffs' prospective economic advantage.

Defendants argue that they are not liable for intentional interference on three bases: (1) Defendants had no knowledge of the relationship between Bold Home and Amazon, and ECT lacked a relationship with Amazon; (2) Plaintiffs' problematic business practices themselves caused the termination of their relationship with Amazon; and (3) Plaintiffs could prove no damages given they were able to sell their products on a different storefront the day after being terminated from Amazon. With respect to Plaintiffs' intentional interference with a prospective economic advantage claim, Defendants argue further that Bold Home has no claim since it sold all its assets to ECT and thus has no future sales to disrupt.

Plaintiffs claim that the record indicates ECT had a relationship with Amazon, as the contact related to the Bold Home account and through selling other, non-Peeps products on

Amazon. Plaintiffs submit various pieces of evidence indicating Defendants were aware that Bold Home was a separate entity from ECT and was selling Defendants' products on Amazon. (*See, e.g.,* Patton Aff., ECF No. 88 at 60; Patton Email, ECF No. 91-41). Plaintiffs also contend that Amazon confirmed to CarbonKlean that it terminated Bold Home due to CarbonKlean's false allegations about the criminal lawsuit. (Email from Amazon, ECF No. 92-29 at 1). Plaintiffs also argue that ECT's October 2019 purchase of Bold Home's assets is irrelevant because ECT afterward maintained Bold Home's relationship and prospective economic advantage with Amazon. Finally, Plaintiffs dispute CarbonKlean's argument that ECT moved products from Bold Home's Amazon storefront to another storefront (Banyan Marketplace) and thus suffered no damages. Instead, Plaintiffs contend, ECT sold some Peeps *to* Banyan Marketplace, which then sold Peeps on Amazon.

Intentional interference with business relationships "generally occur when a person without a privilege to do so, induces or otherwise purposely causes a third person not to enter into or continue a business relation with another, or not to perform a contract with another." *A & B-Abell Elevator Co. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 14, 651 N.E.2d 1283, 1294 (1995). The interference must be "by someone who is not a party or agent of the party to the contract or relationship at issue." *Gibson Bros. v. Oberlin College*, 9th Dist. No. 19CA011563, 2022-Ohio-1079, 187 N.E.3d 629, ¶ 63. The elements essential to recovery for a tortious interference with a business relationship are: (1) a business relationship; (2) the tortfeasor's knowledge thereof; (3) an intentional interference causing a breach or termination of the relationship; and (4) damages resulting therefrom." *Cooper v. Jones*, 4th Dist. Jackson No. 05CA7, 2006-Ohio-1770, ¶ 18. The elements also apply to interference with prospective economic

advantage. *See, e.g., Jedson Eng'g, Inc. v. Spirit Const. Servs., Inc.,* 720 F. Supp. 2d 904, 923 (S.D. Ohio 2010).

There remains a genuine issue of material fact regarding whether Amazon's removal of Plaintiffs from its marketplace was *caused* by Defendants' false statements. (*See* ECF No. 104 at 17). Given that causation is an element that must be satisfied to recover on an intentional interference claim, this outstanding issue precludes summary judgment. *See Cooper* at ¶ 18. This Court thus **DENIES** both Motions as to both Counts VIII and IX.

### C. Defendants' Claims

#### 1. *Count II: Breach of Contract*

Defendants seek summary judgment on its claims that "ECT and/or Bold Home" materially breached the Supplier Agreement and the Amendment Agreement by: (1) continuing to sell CarbonKlean's Products after the Agreement terminated; (2) selling the Products contrary to the pricing terms in Paragraph 3 of the Amendment Agreement; (3) representing to Amazon that they represented CarbonKlean after the Agreement terminated; and (4) creating unapproved ASINs. (ECF No. 8 at 71–72).

Defendants' argument on this claim is essentially a restatement of the grounds for its claim. Plaintiffs argue each of Defendants' bases for their breach of contract claim. First, Plaintiffs argue, there is no term in either the Supplier or Amendment Agreements prohibiting Plaintiffs from continued sales of existing inventory on any online platform. Second, Plaintiffs argue that CarbonKlean failed to show damages from the alleged breach because they present no evidence showing Plaintiffs made a single sale for less than the agreed-upon price. Third, Plaintiffs contend, no provision in either agreement requires either ECT or Bold Home to stop operating as the Amazon Brand Manager or Administrator or stop using Amazon ASINs following termination of

the Supplier Agreement. Last, Plaintiffs maintain, Defendants breached the Non-Solicitation and Non-Circumvention provisions of the Supplier Agreement themselves by signing an agreement with Pharmapacks to exclusively sell their products on Amazon.

Under California law, the elements of a cause of action for breach of contract are "(1) the existence of the contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4) the resulting damages to the plaintiff." *Oasis*, 51 Cal.App.4th at 821. The obligations of the parties to a contract are either dependent or independent. *See Colaco,* 25 Cal.App.5th at 1182. The parties' obligations are dependent such that one party is excused in the event the other party fails to perform when the performance by one party is a condition precedent to the other party's performance. *Id.* But "where covenants of a contract are to be performed at different times, they are independent" and non-performance does not excuse the other party from the contract. *Id.*

Based on the record evidence, Plaintiffs present a genuine issue of material fact concerning whether Defendants breached the Supplier Agreement when they continued to operate on Amazon's platform through Pharmapacks after terminating the Supplier Agreement. Further, Defendants have not adduced evidence that Plaintiffs' alleged breaches caused resulting damages. *See Oasis*, 51 Cal.App.4th at 821. Summary judgment is thus improper. This Court accordingly **DENIES** Defendants' Motion as to its breach of contract claim.

### 2. *Counts III and IV: Promissory Estoppel and Unjust Enrichment*

The parties filed cross-motions for summary judgment on Counts III and IV of Defendants' Counterclaims for unjust enrichment and promissory estoppel. Pursuant to California law, "unjust enrichment is an action in quasi-contract and is not cognizable when there is a valid and enforceable contract between the parties." *Copart, Inc. v. Sparta Consulting, Inc*., 339 F. Supp. 3d

959 (E.D. Cal. 2018) (quoting *Cont'l Cas. Co. v. Enodis Corp.*, 417 F. App'x 668, 670 (9th Cir. 2011)). If an express contract governs the same dispute, an unjust enrichment claim cannot survive. Similarly, a party cannot sustain a cause of action for promissory estoppel under California law where "a valid contract, supported by consideration, governs the same subject matter as the alleged promise." *Horne v. Harley-Davidson, Inc.*, 660 F. Supp. 2d 1152, 1163 (C.D. Cal. 2009); *Walker v. KFC Corp.*, 728 F.2d 1215, 1220 (9th Cir. 1984).

The facts supporting Defendants' claims for promissory estoppel and unjust enrichment are identical to those which underlie their breach of contact claim. (*See* ECF No. 8 at 71-74; ECF No. 86 at 16-17). Defendants do not dispute that the Supplier Agreement (ECF No. 1-1) which created their contractual relationship is a valid, enforceable contract. *See Horne*, 660 F. Supp. 2d at 1163. As such, this Court **GRANTS** Plaintiffs' Motion dismissing these claims.

### 3. Count V: Conversion

Count V of Defendants' Counterclaims asserts claims against Plaintiffs for conversion arising from Plaintiffs' alleged use of CarbonKlean's brand identity on their Amazon storefront to sell Peeps without CarbonKlean's consent. Parties filed cross-motions for summary judgment on this claim.

Defendants argue that CarbonKlean's "brand and sales" are cognizable property interests for purposes of their conversion claim because CarbonKlean's brand identity was tied to a written document (the Amazon Brand Registry Authorization) and contractually protected by the Brand Registry Authorization. (ECF No. 105 at 5-6) (citing *Joyce v. Gen. Motors Corp.*, 49 Ohio St.3d 93, 96, 551 N.E.2d 172, 174 (1990)). The issue of damages, Defendants contend, is appropriate for resolution in the damages portion of the trial. Plaintiffs argue that Defendants' claim fails because CarbonKlean's "brand and sales" do not constitute cognizable property. Plaintiffs argue

that Defendants fail the test laid out in *Kremen v. Cohen,* 337 F.3d 1024 (9th Cir. 2003) for establishing a cognizable property interest where the conversion claim involves intangible property for the following reasons: (1) "brand and sales" cannot have a "precise definition," showing a "well-defined interest"; (2) "brand and sales" are not subject to "exclusive control" because CarbonKlean and Pharmapacks both control Peeps; and (3) "brand and sales" have no connection to any tangible interest. At any rate, Plaintiffs contend, Defendants presented no evidence of damages sustained from the alleged conversion.

The elements of a conversion claim under Ohio law are "(1) plaintiff's ownership or right to possession of the property at the time of the conversion; (2) defendant's conversion by a wrongful act or disposition of plaintiff's property rights; and (3) damages." *Lee v. Ohio Educ. Ass'n,* 951 F.3d 386, 393 (6th Cir. 2020) (citing *Dice v. White Family Cos.*, 2nd Dist. No. 22057, 173 Ohio App.3d 472, 2007-Ohio-5755, 878 N.E.2d 1105, ¶ 17). Conversion and breach of contract are alternate causes of action; therefore, a litigant may not recover under both theories. *Patel v. Strategic Group, L.L.C.*, 8th Dist. No. 109043, 2020-Ohio-4990, 161 N.E.3d 42, ¶ 42.

Even if Defendants established that its "brand and sales" constitute cognizable property, Defendants have failed to produce any evidence of damages resulting from Plaintiffs' alleged misuse of the property. *See Lee,* 951 F.3d at 393. This is fatal to Defendants' claim. Accordingly, this Court **GRANTS** Plaintiffs' Motion dismissing this claim.

### 4. Counts VI and VII: Trademark and Patent Infringement

The parties filed cross-motions for summary judgment concerning Counts VI and VII of Defendants' Counterclaims asserting trademark and patent infringement claims. Specially, Count VI alleges that ECT and Bold Home used CarbonKlean's marks—their Products—in the sale of the Products on Amazon without CarbonKlean's consent in violation of Section 32 of the Lanham

Act, 15 U.S.C. §§1114, *et seq.* Count VII alleges that Plaintiffs ECT and Bold Home violated 35 U.S.C. § 271 in their sale, use, or offer to sell CarbonKlean's Products without CarbonKlean's consent.

Plaintiffs argue that Defendants lacked standing to bring suit for either patent or trademark infringement at the time the instant action was filed. The record shows, Plaintiffs assert, that the only agreement executed between the patent holder (Parkside) and CarbonKlean respecting any intellectual property was signed on April 21, 2021. Defendants argue that the 2015 MOU signed between Patton and Parkside created an irrevocable license for CarbonKlean to sell the Peeps product. Defendants also submit that the Joint Venture Agreement signed by Parkside and CarbonKlean in 2021 merely memorializes the non-written irrevocable license—which constitutes an assignment—that Parkside gave CarbonKlean in 2015.

A court may exercise jurisdiction over an infringement action only if the claimant has standing to sue on the date the plaintiff files suit. *Abraxis Bioscience, Inc. v. Navinta LLC,* 625 F.3d 1359, 1364 (Fed. Cir. 2010). Section 32 of the Lanham Act provides that a "registrant" may bring suit for trademark infringement if a person, "acting without the consent of the registrant . . . use[s] in commerce any . . . registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . . " 15 U.S.C. § 1114(1)(a). The term "registrant" also includes "legal representatives, predecessors, successors and assigns of such applicant or registrant." 15 U.S.C. § 1127. "A party proves trademark infringement by showing (1) that it owns a trademark, (2) that the infringer used the mark in commerce without authorization, and (3) that the use of the alleged infringing trademark 'is likely to cause confusion among consumers regarding the origin of the goods offered by the parties.'" *AWGI, LLC v. Atlas*

*Trucking Co., LLC*, 998 F.3d 258, 264 (6th Cir. 2021). Some courts have found that an exclusive licensee can have standing if "the agreement transfers to the licensee all of the licensor's rights in the use of the trademark, or where the agreement grants the licensee exclusive use of the mark without restricting the licensee's ability to enforce the mark." *Sream, Inc. v. Kanku Express #21*, 2022 WL 989406, at *4 (E.D. Tenn. Mar. 16, 2022), *report and recommendation adopted*, 2022 WL 990507 (E.D. Tenn. Mar. 31, 2022); *see Bliss Clearing Niagara, Inc. v. Midwest Brake Bond Co.,* 339 F. Supp. 2d 944, 959–60 (W.D. Mich. 2004).

A patent infringement claim under 35 U.S.C. § 281 can be brought by either a patentee in its own name or an exclusive licensee in some circumstances. *Textile Prods., Inc. v. Mead Corp.*, 134 F.3d 1481, 1484 (Fed. Cir. 1998). A licensee is not entitled to bring suit in its own name as a patentee, unless the licensee holds "all substantial rights" under the patent. *Id.* An exclusive licensee who lacks all substantial rights only has standing to sue third parties if the licensee is a co-plaintiff with the patentee or if allowing the suit is otherwise "necessary to prevent an absolute failure of justice, as where the patentee is the infringer, and cannot sue himself." *Id.* The patentee must have clearly "promised, expressly or impliedly, that others shall be excluded from practicing the invention within the field covered by the license" to create an exclusive license. *Id.* A license is not exclusive if "a patentee-licensor is free to grant licenses to others." *Id.*

Because Defendants have not alleged or demonstrated that they were granted an exclusive license, they lack standing to sue for either trademark or patent infringement. *See Textile Prods., Inc.,* 134 F.3d at 1484; *Bliss Clearing Niagara, Inc.*, 339 F. Supp. 2d at 959–60. Neither the 2015 MOU (ECF No. 87-1 at 69–72) nor the 2021 Joint Venture Agreement (ECF No. 91 at 33–68) provide CarbonKlean or Patton with an exclusive license. The Joint Venture Agreement only grants to CarbonKlean an "irrevocable license," while the 2015 MOU makes no mention of

CarbonKlean at all. Whether a license is "irrevocable" has no bearing on whether it is exclusive. *See, e.g., Asset Mktg. Sys., Inc. v. Gagnon,* 542 F.3d 748, 757 (9th Cir. 2008) (analyzing separately whether a license granted by Defendant was nonexclusive and whether it was irrevocable). Further, the record fails to support Defendants' claims that CarbonKlean was provided even an "irrevocable license" prior to suit being filed in this case. This Court thus **GRANTS** Plaintiffs' Motion on these claims.

### 5. *Count VIII: Fraud*

The parties filed cross-motions for summary judgment on Count VIII of Defendants' Counterclaims alleging fraud. Specifically, Defendants' Count VII alleges that Plaintiffs misrepresented their business relationship with CarbonKlean and presenting fraudulent documents to Amazon concerning CarbonKlean's Products.

Defendants' arguments supporting their fraud claim are like those underlying its claim for breach of contract: that Plaintiffs forged documents to Amazon allowing them to sell CarbonKlean's products without their consent and misrepresented to CarbonKlean the business relationship between ECT and Bold Home. Just as they did for their breach of contract claims, Defendants argue that evidence of damages will be presented at a future damages hearing. Plaintiffs argue that Defendants' fraud claim is precluded by the existence of a valid contract given that the only duty that it owes Defendants is that which was created by the Supplier Agreement. On the merits, Plaintiffs contend that there is no evidence that Defendants misrepresented the business relationship between ECT and Bold Home to Defendants nor that Defendants relied on the alleged misrepresentation to their detriment.

Under Ohio law, a party may not maintain a fraud claim which "arises from the same conduct supporting a breach of contract claim unless the fraud claim stems from a separate and

independent duty unrelated to the parties' contractual obligations." *King v. Hertz Corp.*, No. 1:09 CV 2674, 2011 WL 1297266, at *2 (N.D. Ohio Mar. 31, 2011). The elements of a fraud claim under Ohio law are:

> (1) a representation or, where there is a duty to disclose, concealment of a fact, (2) that is material to the transaction at hand, (3) made falsely, with knowledge of its falsity, or with such utter disregard and recklessness as to whether it is true or false that knowledge may be inferred, (4) with the intent of misleading another into relying upon it, (5) with justifiable reliance by the injured party upon the representation or concealment, and (6) resulting injury proximately caused by the reliance.

*Ettayem v. Land of Ararat Invest. Group, Inc.*, 10th Dist. No. 17AP-93, 2017-Ohio-8835, 100 N.E.3d 1056, ¶ 42 (citing *Burr v. Bd. of Cty. Commrs.*, 23 Ohio St.3d 69, 491 N.E.2d 1101 (1986), paragraph two of the syllabus). Similarly, the elements of fraud under California law are "(a) misrepresentation (false representation, concealment, or nondisclosure); (b) knowledge of falsity (or 'scienter'); (c) intent to defraud, i.e., to induce reliance; (d) justifiable reliance; and (e) resulting damage." *Herrejon v. Ocwen Loan Servicing, LLC*, 980 F. Supp. 2d 1186, 1202 (E.D. Cal. 2013) (quoting *Beckwith v. Dahl*, 205 Cal. App. 4th 1039, 1060 (2012)).

The Assignment provision of the Supplier Agreement provides expressly that ECT could assign "any or all of its rights or obligations" without Defendants' consent. (ECF No. 1-1 ⁋19). But even assuming Plaintiffs intentionally misrepresented or concealed their business relationship, Defendants have presented no evidence that they relied on the falsehoods such that they incurred "resulting injury." *Ettayem* at ¶ 42. As such, summary judgment is proper. This Court thus **GRANTS** Plaintiffs' Motion dismissing this claim.

## IV.    CONCLUSION

Following careful consideration and the benefit of oral argument, this Court **GRANTS IN PART AND DENIES IN PART** Plaintiffs' First Summary Judgment Motion (ECF No. 85), **GRANTS** Plaintiffs' Second Summary Judgment Motion (ECF No. 86), **GRANTS IN PART AND DENIES IN PART** Defendants' First Summary Judgment Motion (ECF No. 87), and **DENIES** Defendants' Second Summary Judgment Motion (ECF No. 88).

As the result of this Court's holding, this Court hereby **GRANTS** summary judgment in Plaintiffs' favor with respect to their Count VI defamation claim and otherwise **DISMISSES** Plaintiffs' Count III and Defendants' Counts III–IX.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATED:  January 11, 2023**